# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| NIGIST TEKLEHAIMANOT, | ) | |
| OVADIS CHEATHAMS, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:08 CV 220 |
| | ) | |
| PARK CENTER, INC., | ) | |
| Defendant. | ) | |

## OPINION and ORDER

Plaintiffs were employees of defendant's residential center for juvenile offenders. The events giving rise to this case unfold from an escape by one of the residents on Christmas night in 2007. Defendant placed plaintiffs on paid suspension pending an investigation of the escape, and plaintiffs later filed a complaint against defendant for race and age discrimination and retaliation. (Pls.' Am. Complaint, DE # 16.) Defendant Park Center, Inc. ("Park Center") has moved for summary judgment on all of plaintiffs' claims. (Def.'s Mot. for Summ. J., DE # 25; Def.'s Br. in Supp. of Mot. for Summ. J., DE # 26.) Plaintiffs Nigist Teklehaimanot ("Teklehaimanot") and Ovadis Cheathams ("Cheathams") have filed a response in opposition to the motion for summary judgment (Pls.' Resp. in Opp'n. to Summ. J., DE # 31), and Park Center has filed a reply. (Def.'s Reply to Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. 1, 5, DE # 35.) For the reasons explained below, the motion will be **granted.**

## I.    BACKGROUND

The facts in this summary are either undisputed, or, when in dispute, resolved in favor of the non-moving parties, Teklehaimanot and Cheathams. *See Popovits v. Circuit*

*City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The court has included some facts as

Park Center sees them in order to explain the parties' dispute.

A. *The parties*

i. Park Center

Park Center operates the Redwoods, a high security, residential facility for male

juveniles who have committed sex offenses. (Teklehaimanot Dep. 50-53[1], Def.'s Exh. A

to Br. in Supp. of Mot. for Summ. J., DE # 26-1.)

ii. Nigist Teklehaimanot

Teklehaimanot, an African-American woman, applied for a position at Park

Center in March, 2007. (Teklehaimanot Dep. 49.) She was interviewed by Marsha

Wallace ("Wallace") and Keri Virgo ("Virgo") and was hired as a Casemanager 2 for the

Redwoods in April, 2007. (*Id.* at 48-49.) She worked the second shift, from 3 p.m. to

11 p.m. (*Id.* at 53.) The Casemanager 2 job description was read to Teklehaimanot before

she started working. (*Id.* at 54-55.) She understood that her duties were to monitor and

assist clients in their everyday living, to give them their medication, to plan daily

activity lessons, and to continuously maintain clients' safety and well-being. (*Id.* at 53.)

---

[1] The exhibits to defendant's Brief in Support of Summary Judgment and
plaintiffs' Response in Opposition of Summary Judgment include pages of depositions
of Teklehaimanot, Cheathams, Virgo, and Lindsey Souder ("Souder") (formerly Lindsey
Flosenzier). When citing to these depositions, the court cites to the page numbers
assigned to them by the professional reporter. For all other documents, page citations
are to the page numbers assigned by the court's cm/ecf system.

On her first day of work at the Redwoods, Teklehaimanot read and signed several different documents related to Park Center's expectations for her employment. First, Teklehaimanot received, read, and agreed to a document entitled "Residential Care Philosophy" that outlined staff member behaviors that were expected and forbidden. (*Id.* at 87-88; Def.'s Exh. D to Br. in Supp. of Summ J., DE ## 26-1, 26-2.) Among behaviors that the document listed as "totally inappropriate" and "must not occur" were breaking confidentiality and leaving clients unsupervised or unattended. (*Id.*; Teklehaimanot Dep. 93.) The document stated that failure to "honor the spirit and the letter of these expectations will result in disciplinary action." (*Id.* at 93-94; Def.'s Exh. D.) That day Teklehaimanot also signed a confidentiality statement that stated:

> I understand and agree that in performance of my duties at Park Center, Inc. I must hold company information in confidence. Further, I understand that all electronic information that I have access to and/or create or modify is the property of Park Center, Inc. I understand that intentional or involuntary violation of confidentiality or deletion or destruction of any electronic information may result in my dismissal and/or legal action.

(Def.'s Exh. E to Br. in Supp. of Summ J. 2, DE # 26-2; Teklehaimanot Dep. 88-89.) Teklehaimanot also received a copy of Park Center's Code of Ethics, and she signed a document indicating that she read it, understood it, and agreed to abide by it. (*Id.* at 90; Def.'s Exhs. F & G to Br. in Supp. of Summ J. 3-6, DE # 26-2.) The Code of Ethics required staff to "respect the clients' right to quality health care and to private and confidential services." (*Id.*) It stated: "Confidentiality will only be breached when required by law or in potentially life-threatening situations." (*Id.*) Last, Park Center

gave Teklehaimanot a copy of its HIPAA compliance policy and went over it with her. (Teklehaimanot Dep. 95; Def.'s Exh. I to Br. in Supp. of Summ. J. 7-42, DE # 26-2.) The policy defined confidentiality as:

> the respective protocol for handling highly sensitive information. It is a conscious effort by every person to keep all client information, whether it be written, spoken, computerized, taped, overheard, observed, etc., private.

(*Id.* at 14.) The policy explained that "protected health information" included the client's presence in the facility and any identifying information for the client. (*Id.*) The policy specified:

> Employees are not to keep any medical records in their office overnight; records must be returned to and secured in the appropriate medical records location at the end of each day. Client medical records are never to be taken off grounds without proper approval.

(*Id.* at 26-27.)

### iii.   Ovadis Cheathams

Cheathams, an African-American man, began employment at Park Center on October 8, 2007, as a Behavioral Health Technician 3. (Cheathams Dep. 46, Def.'s Exh. B to Br. in Supp. of Summ. J., DE # 26-3.)

Before working at the Redwoods, Cheathams worked as a case manager for a center assisting felons and sexual offenders in returning to their communities. (Cheathams Dep. 17.) He quit that job after ten months because he was "burned out." (*Id.*) He also worked as a group home trainer for Anthony Wayne Services for about eight months. (*Id.* at 20.) While employed there, he informed management of problems

with the clients' living conditions. (*Id.* at 21.) When he was not able to convince them to change the conditions, he developed a negative attitude and quit so as not to spread it to his clients or co-workers. (*Id.* at 21-22.) After he left Park Center, Cheathams was hired by Arizona Counseling and Treatment Services at a pay rate that was three dollars more per hour than his rate at Park Center. (*Id.* at 24-25.)

B.    *The Redwoods*

Clients of the Redwoods were usually placed there by court order and not allowed to leave the facility, and the entire facility was locked down. (Teklehaimanot Dep. 50-53, 63.) The Redwoods had two separate living pods, Residences A and B. (*Id.* at 59.) Each client had his own room that opened upon a common area. (*Id.* at 60.) Each residence had an office that looked out into the residence so that employees could oversee it. (*Id.* at 60-62.) There were three doors at the entrance of the Redwoods. From the inside going out, the first two doors were equipped with alarms. (*Id.* at 86-87.) From the outside, the first door was usually unlocked, but the second and third doors were locked and could only be opened by key or being buzzed in. (*Id.* at 57-58.) All doors were monitored by cameras which could be watched from the two offices. (*Id.* at 62.) Keri Virgo was the Redwoods Manager. (Virgo Dep. 13, Def.'s Exh. E to Br. in Supp. of Summ. J., DE 26-5.)

C.    *Lindsey Flosenzier*

Lindsey Flosenzier ("Flosenzier"), a Caucasian woman, began working as a Behavioral Health Technician 2 at Redwoods on December 3, 2007. (Lindsey Souder[2] Dep. 13-15, Def.'s Exh. D to Br. in Supp. of Summ. J., DE # 26-5.) Prior to December 25, 2007, she was shadowing and training. (*Id.* at 18.) December 25, 2007 was her first day working independently. (*Id.*)

The parties dispute Flosenzier's level of training, who she reported to, and her rank. (Def.'s Br. 11; Pls.' Resp. 2.) According to Park Center, Flosenzier was not trained in non-physical crisis intervention until after December 25, 2007. (Def.'s Br. 12.) Flosenzier stated that she did not take this training until January 11, 2008. (Souder Dep. 15-16.) She stated that between December 3, 2007, and January 11, 2008, no one at Park Center or the Redwoods had talked to her about the policies and procedures as to a client running away. (*Id.* at 16.) Flosenzier stated that on December 25, 2007, she reported to Teklehaimanot and Cheathams. (*Id.* at 19.) She testified that they were in charge because their positions were Casemanager 2 and Behavioral Technician 3. (*Id.*) She stated that Virgo told her that she reported to them and that they were the lead staff. (*Id.*) However, Flosenzier admitted that her job description stated that she reported to the Department Manager, Virgo. (*Id.* at 20-21; Pls.' Exh. 1 to Pls.' Resp. in Opp'n to Summ. J., DE # 31-2.)

_____

[2] Lindsey Flosenzier's changed her last name to Souder after the incident in question. (Souder Dep. 27.)

Plaintiffs object to Park Center's statement that Flosenzier was the "lowest ranking employee on duty" the night of December 25, 2007. (Pls.' Resp. 2; Def.'s Br. 11.) In support of its statement, Park Center points to Cheathams' deposition testimony:

> Q: Between [you and Ms. Teklehaimanot on the] evening [of December 25, 2007,] who had authority over who?
> A: It was one of those situations where, to the best of my knowledge, there was not – there was a equal shared authority.
> Q: And how about Ms. [Flosenzier] in that equation?
> A: Likewise.
> Q: So you think that Ms [Flosenzier] was on the same level as you and Ms. Teklehaimanot?
> A: Yes.
> Q: You don't believe that you had more decision-making and leadership responsibilities?
> A: I believe I do ha . . . did have, uh, more.
> Q: Than Ms. [Flosenzier]?
> A: Yes.
> Q: How about Ms. Teklehaimanot?
> A: Uh, like I s . . . once again, she was always treated as an equal.
> Q: Would you agree that Ms. [Flosenzier] was the lowest ranking staff member that was present that evening?
> A: I would agree with that.

(Cheathams' Dep. 101-02.) It also cites to Virgo's statement that Flosenzier's position, a Behavioral Technician 2, was "a lower grade" than Cheathams' position of Behavioral Technician 3 and Teklehaimanot's position of Casemanager 2. (Virgo Aff. ¶ 6.)

Plaintiffs point to Virgo's deposition testimony to support their statement that Park Center "has no formal written policy which mandates a hierarchy of staff which dictates different standards of performance." (Pls.' Resp. 3.) Here is the part of Virgo's testimony that plaintiffs cite to:

Q: And your testimony is that Ms. Flosenzier wasn't [suspended] because she hadn't gone through training yet?

A: Ms. Nigist was suspended primarily due to the fact that she was a senior staff. She did have knowledge that two staff are supposed to respond when a client is acting out or it looks like a seclusion or a restraint type situation. Ms. Nigist failed to act, which is why she was suspended, why we completed the investigation.

***

Q: Two staff are responsible for it?

A: Yes.

Q: Couldn't that other staff have included Ms. Flosenzier?

A: No.

Q: Why not?

A: Because Ms. Flosenzier was not trained in crisis intervention.

Q: Was Ms. Nigist and Mr. Cheathams informed of that before that night that Ms. Flosenzier hadn't been trained yet?

A: I don't know.

****

Q: [W]ith regard to the fact that Ms. Flosenzier, because she hadn't undergone the non-physical crisis intervention training she is not to be held responsible for a client running away on her shift. Is that written anywhere?

A: That is stated in the manner you just stated it, no.

Q: So there's no written policy anywhere under Park Center or Redwoods for that matter that says that, that's the policy you guys had with Ms. Flosenzier?

***

A: No.

(Virgo Dep. 79-81.)

D.      *The incident of December 25, 2007*

On December 25, 2007, Teklehaimanot, Cheathams, and Flosenzier were working at the Redwoods in Residence A.[3] (Teklehaimanot Dep. 64, 70.) On December 25, 2007, one resident, referred to as D.M., became upset that staff turned off the movie he was

---

[3] They each gave a written statement about the incident to Park Center a day or two after it occurred. (Def.'s Exhs. L & M to Br. in Supp. of Summ. J. 3-6, DE # 26-4.)

watching to start a group session. (Def.'s Exh. M, Flosenzier Written Statement 6; Def.'s Exh. L, Cheathams Written Statement 3.) D.M. started to kick garbage cans and then went to the unit's exit. ( Def.'s Exh. L, Cheathams Written Statement 3.) Cheathams followed D.M. (*Id.*) D.M. went into the hallway that lead to the exit and set off the alarms. (*Id.*) Cheathams convinced D.M. to come back into the residence and participate, and D.M. did so without further problems that time. (*Id.*)

Later that evening, the residents were served a Christmas dinner. (Teklehaimanot Dep. 71-72) D.M. was complaining about his meal and being disruptive. (*Id.* at 72.) When the residents were supposed to discuss their plans for the evening, D.M. began throwing chairs, calling the staff members names, and encouraging the residents not to participate in the group session. (*Id.* at 73-74.) The other residents were placed in their rooms for safety, while all three staff members remained in the common area with D.M. who would not calm down. (*Id.* at 75.) At some point Teklehaimanot and then Cheathams left the common area and went to the office leaving Flosenzier alone in the common area with D.M. (*Id.* at 75-76.) D.M. told Flosenzier that he was tired of being locked up, felt like he wanted to run away, and was going to run soon.[4] (Souder Dep. 22; Def.'s Exh. M, Flosenzier Written Statement 6.) He picked up a

---

[4] At a December 11, 2007 staff meeting, staff were told to report client discussions of running away. (Virgo Dep. 14.) In her deposition, Flosenzier stated that she told Teklehaimanot and Cheathams that D.M. had talked to her about running away. (Souder Dep. 22-23.) In her written statement of the event, Flozenzier did not state that she had reported her conversation to Teklehaimanot and Cheathams. (Def.'s Exh. M, Flosenzier Written Statement 6.)

Gatorade bottle and squirted water on the walls, windows and floors. (*Id.*) He also mimed shooting Teklehaimanot through the window to the office. (*Id.*) Flosenzier went into the office, and Cheathams went into the open area. (Teklehaimanot Dep. 77.)

D.M. started to put on his shoes and continued to talk to Cheathams about running away. (Cheathams Written Statement 3.) D.M. said that he could outrun staff. (*Id.*) He also expressed anger at the staff members, including stating that he wanted to "chop [Teklehaimanot's] head off and cut her up in a . . . million pieces." (*Id.*) D.M. asked Cheathams for his coat and Cheathams refused. (*Id.*) D.M. yelled at Cheathams and began to exit the unit. (*Id.*) Cheathams followed him to the first door and D.M. hesitated. (*Id.*) Cheathams continued to talk to D.M., attempting to persuade him to return, but D.M. ran out of the last two doors and away from the building with Cheathams following. (*Id.*; *see also* Cheathams Dep. 67-70.) Cheathams had been trained to position himself between the resident and the door to prevent escape. (Cheathams Dep. 71.) But he did not do that on the night of December 25, 2007. (*Id.*)

Teklehaimanot did not observe D.M. going through the first door. (Teklehaimanot Dep. at 83.) When she heard the alarm go off when D.M. pushed the first door, Teklehaimanot stayed in the office to monitor what was happening. (*Id.* at 84.) D.M. had exited through the first door before and, in Teklehaimanot's experience, D.M. would then sit between the doors. (*Id.* at 84.) Teklehaimanot got up to

help Cheathams just before D.M. went through the second door.[5] (*Id.* at 85.)

Teklehaimanot saw D.M. exit through the last door,[6] and then returned to the office to

ask Flosenzier to call Virgo immediately. (*Id.* at 86.) Teklehaimanot called the police.

(*Id.*) Flosenzier stated that she had not left the office because she had not had any

[5] Park Center cites to page 85 of Teklehaimanot's deposition and states that
"Teklehaimanot did get up to assist Cheathams but only after D.M. had gone through
the second door." (Def.'s Br. 12.) However, this statement does not comport with
Teklehaimanot's statements:

> Q: Did you ever get up to attempt to assist Mr. Cheathams?
> A: Yes, I did.
> *****
> Q: Where was [D.M.] when you did that?
> A: [D.M.] was just coming out of the second door.
> Q: He was just going through the second door?
> A. Through the second door.
> Q: When you got up.
> A: When I got on the hallway.
> ****
> Q: What did you do when you got up?
> A: I opened the door that he got out of, and I get to the front door. I mean, to
> the – as I saw Mr. Cheathams is right behind [D.M.], and they were getting
> out of the second door, he was getting out the second door, I immediately
> followed them, and he had – by that time he had gone through the third
> door, the fourth door.

[6] There is some confusion about whether the exit from the building had three or
four doors. (Teklehaimanot Dep. 86.)

"seclusion and restraint or CPI or positioning training."[7] (Souder Dep. 25.) She also

stayed to supervise the unit because someone was required to do so at all times. (*Id.*)

> E.     *Park Center's training on restraint and positioning*

As mentioned above, Park Center provided staff with a training called "Non-

Violent Physical Crisis Intervention" which instructed them as to how to restrain in a

safe, therapeutic, and non-violent manner. (Keri Virgo Aff. ¶ 12, Def.'s Exh. to Br. in

Supp. of Summ J., DE # 26-5.) This training should have been completed before staff

began "direct job-specific responsibilities."[8] (Park Center's Prevention and Management

of Workplace Violence Policy 6, Pls.'s Exh. to Resp. in Opp'n to Summ. J., DE # 31-3.)

---

[7] Plaintiffs contest this statement for three reasons: 1) all staff were required to be trained before they started working, 2) Flosenzier was present at the December 4, 2007 staff meeting at which Virgo discussed the restraint policy, and 3) Flosenzier was sent the December 14, 2007 e-mail in which Virgo wrote that two staff members needed to respond when an alarm went off. (Pls.' Resp. 3.) The court presents plaintiffs' version of these facts as relevant in its discussion below.

[8] Plaintiffs assert that "[d]efendant's own policy pertaining to Non-Violent Physical Crisis Intervention mandates that all staff must be trained before working." (Pls.' Br. 3.) In support of this assertion, they cite to Park Center's policy without providing a specific page number or otherwise directing the court to the relevant portion of the policy. (Pls.' Br. 3.) The court cannot find where the policy says that all staff need to complete the Nonviolent Crisis Intervention training before working. The policy states that new staff "shall receive Prevention Workplace Violence training prior to performing any direct job-specific responsibilities." (Park Center's Prevention and Management of Workplace Violence Policy 6.) It appears that the Prevention Workplace Violence training is part of the Non-violent Crisis Intervention training. (*Id.*) The policy states that staff with frequent, direct contact with clients must complete the Nonviolent Crisis Intervention training, but it does not state that this needs to be completed before starting work. (*Id.*) However, the court will accept plaintiffs' position that Park Center's policy was that the Nonviolent Crisis Intervention policy should have been completed before an employee began direct service of clients.

Teklehaimanot undertook this training in March, 2007. (Keri Virgo Aff. ¶ 12.) Flosenzier had not taken this training prior to December 25, 2007. (Souder Dep. 25.) Virgo also never met with Flosenzier to train her on positioning herself in the unit for safety. (Virgo Dep. 91.)

There is some confusion in the record as to what training Cheathams had undergone prior to December 25, 2007. During his first week of training, Virgo met with him and showed him how to position himself on the units for "optimum supervision and safety." (Virgo Dep. 90-91; Cheathams Dep. 71.) Virgo testified that Cheathams underwent the "Non-Violent Physical Crisis Intervention" in November, 2007. (Virgo Dep. 102.) However, she stated that Cheathams had not been trained on Park Center's restraint position before December 25, 2007. (Virgo Dep. 102.) In an affidavit signed five months after she gave her deposition testimony, Virgo stated that Cheathams had undergone the Nonviolent Crisis Intervention training where he had been trained to "restrain in a safe, therapeutic, non-violent manner." (Virgo Aff. ¶ 12.) In his deposition, Cheathams stated first that he had received the Nonviolent Crisis Intervention training during which he was taught different techniques for restraining clients if they became a danger to themselves or others. (Cheathams Dep. 103.) But then he stated that he had not received the Nonviolent Crisis Intervention or training on restraint prior to December 25, 2007. (Cheathams Dep. 103-05.) The court will accept that Cheathams had not had training on restraint before December 25, 2007.

During staff meetings on November 27, 2007, and December 4, 2007, it was discussed that if a client attempted to run away, the staff were to restrain him once he touched the second door. (*Id.* ¶ 8.) Flosenzier was present at the second meeting.[9] On December 14, 2007, Virgo sent an e-mail to staff, including Cheathams, Teklehaimanot, and Flosenzier,[10] stating that any time an alarm went off, at least two staff members needed to respond. (*Id.* ¶ 9.) The e-mail also instructed staff members that when a situation escalated into one requiring restraint, they were to call Virgo or Jennifer Thomas. (*Id.*) The e-mail told staff that there would be a mandatory seclusion and restraint training in January to ensure that everyone was on the same page. (Pls.' Exh. 6 to Resp. in Opp'n to Mot. for Summ. J., DE # 31-6.)

> F.    *What happened with staff after the December 25, 2007 incident*

Virgo's testimony is that Flosenzier was not suspended after December 25, 2007 because it was her first regular day out of training on the unit, she was not senior staff,

---

[9] Plaintiffs make this assertion and cite to "Staff Minutes of 12/4/2007" which they purport is Exhibit 5 to their brief. (Pls.' Br. 3.) The court cannot locate this document in plaintiffs' submissions, but it will assume that plaintiffs' representations of its contents are accurate.

[10] Plaintiffs state that Flosenzier received this e-mail, but they do not point to any evidence to that effect. Virgo does not specify in her affidavit that Flosenzier received the e-mail, but she says she sent it to "staff." (Virgo Aff. ¶ 9.) The e-mail does not list specific recipients; it says it was sent to "the Redwoods" which could likely have included Flosenzier. (Pls.' Exh. to Resp. in Opp'n of Summ. J.) Therefore the court will assume at this stage that Flosenzier received the e-mail.

and she was not trained in crisis intervention.[11] (Virgo Dep. 74-75.) Cheathams was

suspended with pay on December 26, 2007, and Teklehaimanot was suspended with

pay on December 31, 2007. (*Id.* at 75; Virgo Aff. ¶ 13; Teklehaimanot Dep. 104, 150-51;

Cheathams Dep. 66-67.) They were both told, Cheathams in person and Teklehaimanot

by phone, that they were suspended pending an investigation of the events of

December 25, 2007. (Cheathams Dep. 64-65; Teklehaimanot Dep. 100, 151.)

Teklehaimanot was suspended because she was a senior staff member with knowledge

that two staff members were supposed to respond when a client was acting out and

seclusion or restraint appeared necessary. (Virgo Dep. 78-79.) Both Cheathams and

Teklehaimanot were suspended because they did not follow their Non-Violent Crisis

Intervention training, the procedures set forth by Virgo in e-mail, or the guidance given

to them at staff meetings. (Virgo Aff. ¶ 13.) The last day of Cheathams's suspension was

January 9, 2008 (Cheathams Dep. 162), and the last day of Teklehaimanot's suspension

was January 4, 2008. (Def.'s Exh. J to Br. in Supp. of Summ. J., DE # 26-2.)

After the incident, Cheathams had a meeting with Virgo; Wallace, Park Center's

Human Resources Manager; and Anita Wolfe ("Wolfe"), Park Center's Adolescent

Residential Coordinator. (Cheathams Dep. 76-77; Wolfe Aff. ¶ 2, Def.'s Exh. F. to Br. in

Supp. of Summ. J., DE # 26-5.) Virgo, Wallace, and Wolfe explained to Cheathams the

---

[11] Plaintiffs contest this statement, again arguing that all staff were required to be trained before they started working, that Flosenzier was present at a staff meeting covering restraint, that she received an e-mail about restraint, and that there was no written policy about staff hierarchy or different standards of performance. (Pls.' Resp. 3-4.)

seriousness of D.M.'s escape and the circumstances that lead to it. (Cheathams Dep. 77.)

He was given an opportunity to explain his side of the story, but he refused to do so.

(*Id.* at 77-79.) He also refused to sign a letter of final warning. (*Id.* at 81-82; Def.'s Exh. N

to Br. in Supp. of Summ. J., DE # 26-4.) At the meeting, the final warning letter was

discussed with Cheathams. (Cheathams Dep. 82.) They discussed that during the first

week of training, Virgo met with Cheathams and showed him where he needed to

position himself in the units. (*Id.*) They discussed that if proper positioning had been

used, D.M. would not have been able to run out because Cheathams would have been

between D.M. and the door. (*Id.*) Cheathams acknowledged that he had been given

specific instructions on handling D.M. and that he had been told that D.M. was a flight

risk. (*Id.* at 87-88.) Wolfe and Virgo told Cheathams that he put both the community and

D.M. at risk. (*Id.* at 89.) Cheathams knew that D.M. was on medication that he would

not receive if he ran away. (*Id.* at 92.)

The final warning letter to Cheathams provided a list of corrections that he was

to make immediately. (Def.'s Exh. N.) They included not allowing clients to put on

shoes without permission, being in correct positioning in the unit, taking threats to run

seriously, and not involving residents in staff issues. (*Id.*) The letter stated that

violations of the corrections or any other ethical or professional policies could result in

further disciplinary action including termination. (*Id.*) At the meeting, Cheathams

understood that he was not being terminated at that time, but he still refused to sign the

warning. (Cheathams Dep. 94.) He would not discuss any of the corrections. (*Id.*)

The day before this meeting, Cheathams filed a Charge of Discrimination with the City of Fort Wayne Metropolitan Human Relations Committee. (Cheathams Dep. 107.) On November 20, 2008, the Committee issued a report finding that no probable cause existed to show that Park Center discriminated against Cheathams on the basis of race. (*Id.* at 108.) Virgo and Wolfe were not aware of the Charge of Discrimination on January 8, 2008. (Virgo Aff. ¶ 16; Wolfe Aff. ¶ 6.)

Cheathams returned to work for three days after his suspension was lifted. (Cheathams Dep. 95, 162.) Cheathams wrote a letter of resignation to Virgo in which he stated that he was resigning because the Redwoods was a "hostile environment" for him. (Def.'s Exh. P. to Br. in Supp. of Summ. J., DE # 26-4.) He explained that this was "not a matter of what has been said to me or done to me, but how I have responded!" (*Id.*) He also stated that his heart was no longer in Redwoods and its mission. (*Id.*) He felt that the boys of Redwoods "need[ed] a staff that is there for them 100%." (*Id.*) He did not want to be another negative male in their lives. (*Id.*) He thanked Virgo for the opportunity to work at the Redwoods and apologized for letting her down. (*Id.*) He recommended that a white male, Matthew Souder, be promoted into his position. (*Id.*; Cheathams Dep. 97.)

Teklehaimanot met with Virgo and Wolfe on January 4, 2008. (*Id.* at 114.) At that meeting, Teklehaimanot informed Wolfe and Virgo that she had asked Redwoods clients to write statements and that she had taken those statements from the Redwoods facility. (Virgo Aff. ¶ 17.) Wolfe and Virgo informed Teklehaimanot that those

statements were confidential, that they needed to be returned, and that her possession of the statements violated Park Center's confidentiality and HIPAA policies. (*Id.* ¶ 18.) Teklehaimanot maintains that she was not asked to return the documents at that time. (Teklehaimanot Dep. 152.) Her proposed testimony is that Virgo and Wolfe said that the documents were confidential and that they discussed how they were going to get the documents back, but they never asked Teklehaimanot to return the documents. (*Id.* at 115-16.) Virgo characterized Teklehaimanot as "defiant and insubordinate" during that meeting. (Virgo Aff. ¶ 18.)

During the meeting, Teklehaimanot did not discuss any of her ongoing health issues and Virgo and Wolfe did not know that Teklehaimanot's doctor had sent a letter stating that she needed to be absent from work. (*Id.* ¶ 20.) Teklehaimanot submitted a doctor's note stating that she could not return to work until January 14, 2008. (Teklehaimanot Dep. 108.) She was not charged for any paid time off for her medical leave until her suspension was lifted. (*Id.*)

On January 5, 2008, Teklehaimanot wrote to Paul Wilson, the President and CEO of Park Center, complaining about the conditions at the Redwoods and her meeting with Virgo and Wolfe. (Teklehaimanot Dep. at 117-18; Def.'s Exh. L to Br. in Supp. of Summ J., DE # 26-2.) Virgo and Wolfe were not aware of this letter until after discovery for this case had commenced. (Virgo Aff. ¶ 21; Wolfe ¶ 11.) Marsha Wallace, a decision-maker in Teklehaimanot's termination, was aware of Teklehaimanot's letter to Wilson and her doctor's note prior to her termination. (Pls.' Exh. to Br. in Opp'n to Summ. J.,

DE # 31-4; Virgo Aff. ¶ 22.) In the letter, Teklehaimanot informed Wilson that she had been suspended. (Def.'s Exh. L.) She wrote that Redwoods was a hands-off facility, that the staff were not trained to restrain clients in a runaway situation, but that she and Cheathams were suspended for not restraining a client. (*Id.*) She stated that Virgo and Wolfe used "intimidation and fear factor" to ask her questions when she met with them. (*Id.*) She said that after the meeting, she did not have a "viable solution" to her issues or a "clear understanding" of her suspension and how long she would need to be away from work. (*Id.*) She reported that "clients and staff [of the Redwoods] are living and working in a very dangerous and [hostile] environment." (*Id.*)

On January 9, 2008, Virgo called Teklehaimanot and told her that her suspension with pay had been lifted and that she needed to return the documents that she had taken from the premises. (Teklehaimanot Dep. 144; Virgo Aff. ¶ 19.) According to Virgo, Teklehaimanot was again defiant and insubordinate during this phone call. (*Id.*) Virgo was surprised by this since she had also told her that she could return to work. (*Id.*) Teklehaimanot told Virgo that she would give her copies of the statements, but not the originals. (*Id.*) Virgo told Teklehaimanot that she needed to hand over all versions of the statements. (*Id.*) Teklehaimanot said that she would not honor any request that was not in writing. (*Id.*)

On January 9, 2008, Virgo sent Teklehaimanot a letter stating that she needed to return the clients' statements by noon on Friday, January 11, 2008. (Virgo Aff. ¶ 19; Def.'s Exh. P to Br. in Supp. of Summ. J., DE # 26-2.) Virgo picked that date and time

randomly. (Virgo Dep. 99.) The letter reminded Teklehaimanot that keeping the documents violated Park Center's confidentiality and HIPAA policies and informed her that failure to return the documents by the given time could result in further disciplinary action up to and including termination. (Def.'s Exh. P.) Virgo wrote that she understood from Teklehaimanot's doctor's slip that she would return to work on January 14, 2008, and that she, Wolfe, and Teklehaimanot would meet that afternoon to discuss "the written warning we have drafted and the documents mentioned in this letter." (*Id.*) Teklehaimanot admitted that she could have returned the documents, but she chose not to. (Teklehaimanot Dep. 149.) Teklehaimanot testified that she received Virgo's letter on January 11, 2008, and mailed the documents back to Park Center by certified mail the same day. (*Id.* at 153-155.) She did not remember if she still had copies of the documents in her possession. (*Id.* at 155.) Plaintiffs assert, without citing to evidence, that Teklehaimanot never disclosed the statements to any third party. (Pls.' Resp. 2.) Virgo stated that the documents were confidential because they had clients' names in them. (Keri Virgo Dep. 96, Pls.' Exh., DE # 34-1.) Teklehaimanot violated Park Center policy by removing the documents from the facility. (*Id.* at 97.) She understood that these statements could be helpful to the investigation. (*Id.* at 96.)

Teklehaimanot did not return to work on January 14, 2008. (Teklehaimanot Dep. 158.) She had another note from her doctor's office stating that she needed to be absent from work until January 21, 2008. (Def.'s Exh. Q to Br. in Supp. of Summ. J., DE # 26-2.) Wallace, Wolfe, and Virgo decided to terminate Teklehaimanot because she

20

failed to return the documents by the date and time set by Virgo's letter of January 9, 2008. (Virgo Aff. ¶ 22; Wolfe Aff. ¶ 11.)

     G.     *Other runaway incidents*

There were four other runaway incidents at the Redwoods between August, 2007 and the incident of December 25, 2007.[12] There was one incident in September, 2007, in which a client ran away and no action was taken against the staff involved in that incident because at that time Park Center had a no restraint policy for runaways. (Virgo Dep. 40-42.) On October 5, 2007, as clients were lining up after school to get in a van to the Redwoods, one client ran away. (Pls.' Exh. 5 to Resp. in Opp'n to Mot. for Summ. J., DE # 31-5.) On November 23, 2007, a client ran away from the Redwoods. (*Id.*) Just before that, staff called someone named Amy Cook who instructed them not to stand in the client's way and to let him go if he wanted to go. (*Id.*) On December 13, 2007, a client attempted to run away but was restrained. (*Id.*)

     H.     *Plaintiffs' complaints about unequal treatment of African-American clients*

In November 2007, Cheathams told Virgo that he was concerned that African-American clients were receiving harsher consequences than Caucasian clients. (Virgo Dep. 68.) Virgo asked him for specific instances and specific clients, but he did not provide that information. (*Id.*) Plaintiffs have not pointed to any specific evidence showing that Teklehaimanot complained to Park Center administration about the

---

[12] The evidence of these incidents, apart from the one in September 2007, consists of e-mails recounting those incidents and unaccredited handwritten notes on the e-mails.

unequal treatment of African-American clients. In her deposition testimony, she discussed that sometimes African-American clients were treated differently than Caucasian clients. (Teklehaimanot Dep. 130-32.) She also stated that she frequently raised concerns at staff meetings (*Id.* at 134), but she did not identify any specific complaints she made about discriminatory treatment of African-American clients.

I.    *The parties' arguments*

Plaintiffs filed claims of disparate treatment based on race under Title VII, discrimination under the Age Discrimination in Employment Act ("ADEA"), and unlawful retaliation under Title VII against Park Center. (Pls.' Am. Complaint, DE # 16.) Park Center has moved for summary judgment on all of plaintiffs' claims. (Def.'s Mot. for Summ. J. 1; Def.'s Br. 33.) First, it argues that Cheathams' claim of race discrimination should be dismissed because he has no direct evidence of discrimination. (Def.'s Br. 15.) Second, it argues Cheathams also does not have evidence to support a claim of race discrimination under the indirect method because he cannot prove that he suffered an adverse employment action from the paid suspension, he was not constructively discharged, and he cannot point to a similarly situated person outside of his class who was treated more favorably. (*Id.* at 21-23.) Further, it argues that he cannot prove that Park Center's reason for firing him was pretext for discrimination. (*Id.* at 24.)

Park Center argues that Teklehaimanot cannot build a *prima facie* case of race discrimination as required by the indirect method because she did not suffer an adverse employment action from the paid suspension, cannot point to a similarly situated

employee who received more favorable treatment, and cannot show that the reasons given for her termination were a pretext for discrimination. (*Id.* at 25-26.)

Park Center argues that plaintiffs cannot prove their Title VII retaliation claims under either the direct or indirect methods. (*Id.* at 28-29.) It contends that Teklehaimanot's claim centers around her complaints about D.M. and that Cheathams' claim centers around his complaints that African-American residents of the Redwoods were treated worse than Caucasian residents. (*Id.* at 29.) It argues that neither plaintiff has produced direct evidence that Park Center acted against them because of these complaints. (*Id.*) So it argues that they must proceed under the indirect method. It argues that Cheathams cannot do so successfully because he has no evidence that he suffered an adverse employment action. (*Id.* at 30.) It argues that Teklehaimanot cannot succeed by the indirect method because she has no evidence that a similarly situated employee outside of the protected class who did not engage in statutorily protected activity was treated more favorably. (*Id.* at 30.)

In regards to the ADEA claim, Park Center argues that Cheathams' attorney stated, during Cheathams' deposition, that this claim would be dismissed. (*Id.* at 31.) It also argues that Teklehaimanot's ADEA claim should be dismissed because she cannot show that a similarly situated person under the age of 40 who refused to turn over confidential information was treated more favorably. (*Id.* at 32.) She also cannot show that her termination was a pretext for age discrimination. (*Id.*) Finally, Park Center argues that if Cheathams' claims survive summary judgment, the court should consider

that he failed to mitigate damages and he should not be awarded any damages that he claims to have suffered after March 15, 2008. (*Id.* at 32-33.)

In response, plaintiffs defend their claims of disparate treatment and retaliation under Title VII. (Pls.' Resp. 9, 11.) They do not present any argument or evidence in relation to their ADEA claims. Plaintiffs argue that they can prove disparate treatment based on race through the indirect method. (*Id.* at 10.) They argue that Park Center has conceded that they have met two elements of a *prima facie* case under the indirect method - that they were members of a protected class and that they were performing their jobs satisfactorily until the events that gave rise to their suspension. (*Id.* at 10.) They argue that the issue of whether their suspension with pay was an adverse employment action is an issue of fact inappropriate for resolution at the summary judgment stage. (*Id.* at 10-11.) They also argue that Flosenzier was similarly situated to them, was outside of their protected class, and was treated more favorably because she was not placed on paid suspension. (*Id.* at 11.)

Plaintiffs argue that they can prove their claim of retaliation under the indirect method. (*Id.* at 12.) They argue that they engaged in statutorily protected activity by complaining about the unfair treatment of African-American clients and that Teklehaimanot's letter to Park Center' President and CEO, Paul Wilson, about the Redwoods' environment was also a protected activity. (*Id.*) They argue that they were treated less favorably than similarly situated employees, namely Flosenzier and other

employees present at escapes, who did not participate in the protected activity.

(*Id.* at 12-13.)

In reply, Park Center emphasizes that plaintiffs, particularly Cheathams, cannot show that they suffered adverse employment actions. (Def.'s Reply 3.) It argues that plaintiffs do not establish how their suspensions without pay were adverse employment actions and only contend that the issue is a matter of fact. (*Id.* at 4.) Park Center stresses that plaintiffs have also not established a *prima facie* case of discrimination because they have only pointed to Flosenzier as a similarly situated employee. (*Id.*) It states that Flosenzier was not similarly situated to plaintiffs because she had not undergone restraint training, had less experience than plaintiffs, and had a different job title than plaintiffs. (*Id.* at 5.) It also points out that Teklehaimanot has failed to identify any other employee who refused to return confidential information or was insubordinate. (*Id.* at 6.) Further, Park Center contends that plaintiffs cannot establish that its reasons for firing them were pretext for discrimination because they have not produced any evidence to show that the proffered reasons were phony. (*Id.*) Finally, Park Center argues that plaintiffs cannot establish a claim of retaliation because they cannot show that similarly situated employees who did not complain were treated more favorably. (*Id.* at 7.)

## II.     STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and

identifying" those materials listed in RULE 56(c) which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the nonmovant may not rest upon mere allegations. Instead, "[t]o successfully oppose a motion for summary judgment, the nonmoving party must come forward with specific facts demonstrating that there is a genuine issue for trial." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Furthermore, when evaluating a motion for summary judgment, the court views the record and makes all reasonable inferences in a light most favorable to the nonmovant. *Popovits,* 185 F.3d at 731. If the non-moving party cannot establish an essential element of its claim, RULE 56(a) requires entry of summary judgment for that claim. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex*, 477 U.S. at 322-23).

## III.   ANALYSIS

### A.    *Discrimination in violation of the ADEA*

In their complaint, plaintiffs alleged claims of discrimination under the ADEA. (Pls.' Am. Complaint ¶¶ 23-26.) Park Center argues that Cheathams has conceded this claim. (Def.'s Br. 31.) It points to Cheathams' attorney's statement during Cheathams' deposition that: "[w]e'll voluntarily dismiss that [age discrimination claim], because my assumption was it was part of the EEOC Charge, so you don't need to question him on it." (Cheathams Dep. 132.) In their response, neither plaintiff defends their ADEA

claims. Thus, those claims are abandoned because they were not addressed in the response to the motion for summary judgment. *See Filippo v. Lee Publ'ns., Inc.,* 485 F. Supp. 2d 969, 972-73 (N.D. Ind. 2007); *White v. Gerardot,* No. 1:05-CV-382, 2007 WL 541819, at *4 (N.D. Ind. Feb. 15, 2007) (unpublished); *Palmer v. Marion County,* 327 F.3d 588, 597-99 (7th Cir. 2003). Therefore, summary judgment will be entered in favor of Park Center on plaintiffs' ADEA claims.

      B.    *Disparate treatment based on race in violation of Title VII*

Plaintiffs can attempt to support their claim of employment discrimination based on race in one of two ways: either by proffering direct or circumstantial evidence that racial discrimination motivated the employment decision (known as the direct method), or by relying on the indirect, burden-shifting method outlined in *McDonnell Douglas, Corp. v. Green,* 411 U.S. 792 (1973); *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 783 (7th Cir. 2007) (citing *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736-37 (7th Cir. 2006)). Direct evidence is evidence, such as an admission by the decision-maker that the adverse employment action was motivated by discriminatory animus, that allows the trier of fact to find discrimination without relying on inference or presumption. *Nichols,* 510 F.3d at 781; *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 272 (7th Cir. 2004). Circumstantial evidence, more commonly relied upon, allows the trier of fact to find discrimination through inference.[13] *Nichols,* 510 F.3d at 781.

---

[13] The three categories of circumstantial evidence, that can be used together to show a "convincing mosaic" of discrimination are:

Neither plaintiff argues that he or she has direct or circumstantial evidence of discrimination, and they have not produced either kind of evidence. Most of plaintiffs' evidence is that a Caucasian employee, Flosenzier, was treated more favorably than they were. However, this type of evidence can give "rise to an inference of discriminatory intent pursuant to the indirect method of proof, but does not constitute direct evidence of discriminatory motivation." *Lynch v. Belden & Co., Inc.*, 882 F.2d 262, 269 (7th Cir. 1989).

Plaintiffs argue that they can establish their claims of discrimination through the indirect method. Under the indirect method, plaintiffs must first build a *prima facie* case of race discrimination by identifying evidence that establishes: (1) they belonged to a protected class; (2) they were meeting defendant's legitimate performance expectations; (3) they suffered an adverse employment action; and (4) defendant treated similarly situated employees who were not in their protected class more favorably. *See McDonnell Douglas,* 411 U.S. at 802. Park Center admits, for the purposes of summary judgment, that both plaintiffs were members of a protected class and "were performing their job

---

1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; 2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and 3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)); *Troupe v. May Dep't Stores, Inc.*, 20 F.3d 734, 736 (7th Cir. 1994)).

satisfactorily other than the events that gave rise to their suspension."[14] (Def.'s Br. 21.) Thus the court will focus on the third and fourth elements of a *prima facie* case - whether plaintiffs suffered adverse employment actions and whether Park Center treated similarly situated individuals outside of the protected class more favorably.

The third prong of the *prima facie* case is directed towards Title VII's imposition of liability on employers for acts related to the employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). In the United States Court of Appeals for the Seventh Circuit, the cases phrase this as requiring either "a tangible employment action, that is, a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits, or as a 'materially adverse employment action.'" *Herrnreiter v. Chi. Hous. Auth.,* 315 F.3d 742, 744 (7th Cir. 2002) (internal quotations and citations omitted).

---

[14] In cases of discriminatory discipline, the second and fourth prongs merge. *Lucas v. Chi. Transit Auth.,* 367 F.3d 714, 728 (7th Cir. 2004). Because there is no question that the employee failed to meet his employer's expectations, the court analyzes whether a similarly situated employee received less harsh discipline. *Id.* Thus, Park Center's concession on the second prong is somewhat perplexing since it was plaintiffs' performance during "the events that gave rise to their suspension" that lead to the adverse employment action. It seems that Park Center would argue that Cheathams and Teklehaimanot's performance on the night of December 25, 2007, justified their suspension. However, Park Center addresses this in its discussion of pretext instead.

Adverse employment actions are usually "economic injuries such as dismissal, suspension,[15] failure to promote, or diminution in pay." *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761-62 (1998) ("A tangible employment action in most cases inflicts direct economic harm."). An adverse employment action can also be one that imposes future financial harm because it "significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted." *Herrnreiter,* 315 F.3d at 744. Or it can be an action that subjects the employee to changes in his condition that are "humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative." *Id.* In any scenario, an adverse employment action must be something that "materially alter[s] the terms and conditions of employment." *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 704 (7th Cir. 2001).

Plaintiffs argue that Cheathams' fifteen-day paid suspension and Teklehaimanot's five-day paid suspension were adverse employment actions.[16] The

---

[15] In *Markel*, the Seventh Circuit did not resolve the question of whether a paid suspension could constitute an adverse employment action. 276 F.3d at 911. The Seventh Circuit has found that, for a retaliation claim, an unpaid suspension after which the employee is given back-pay can be an adverse employment action. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009).

[16] Plaintiffs argue that the determination of whether an unpaid suspension is an adverse employment action is a question of fact for the jury. (Pls.' Resp. 10-11.) It is true that fact-finding may be needed to evaluate whether an action materially alters work conditions. *See e.g., Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994) (finding that, in the context of First Amendment retaliation claims, the question of whether a plaintiff's new

Seventh Circuit has not specifically determined whether a suspension with pay is an adverse employment action. Therefore, to determine whether plaintiffs have evidence to show that the paid suspensions were adverse employment actions, it is helpful to consider the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72-73 (2006). In the context of retaliation, the Court found that a suspension with back-pay can be an adverse employment action. *Id.* The Court found that there was sufficient evidence in that case to find that the employee suffered an adverse employment action for the purposes of retaliation when she was suspended without pay for thirty-seven days with no income and was unsure if she would be paid even though she was eventually given back-pay. *Id.*

However, this case is distinguishable from *White* for several reasons. First, as explained above, *White* involved a claim of retaliation which has a broader standard for an adverse employment action than that for a discrimination claim. *Lewis v. City of Chi. Police Dep't.*, 590 F.3d 427, 437 (7th Cir. 2009) (noting that the "main take-away from *White* is that the range of conduct prohibited under Title VII's anti-retaliation provision

---

job responsibilities were enough of a downward shift in skills to constitute an adverse employment action was one of fact). However, the Seventh Circuit has regularly affirmed grants of summary judgment when the trial court found that the plaintiffs had not produced enough evidence to support a finding of an adverse employment action. *See e.g., Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 2003) (affirming the district court's grant of summary judgment to defendants because the facts of the case did not support the conclusion that plaintiff's negative performance evaluations alone constituted an adverse employment action); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996); *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 466 (7th Cir. 2002); *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002).

is broader than Title VII's anti-discrimination prohibition") (internal quotations omitted). Second, *White* involved an unpaid suspension after which the employee was given back-pay. In the decision affirmed by the Court in *White*, the appellate court noted that employers could avoid the possibility of liability from a suspension with back-pay by placing employees on paid suspension which would not be an adverse employment action. *White v. Burlington N. & Santa Fe Ry., Co.*, 364 F.3d 789, 803 (6th Cir. 2004); *see also Peltier v. United States,* 388 F.3d 984, 988 (6th Cir. 2004) (stating that a suspension with pay pending an investigation of alleged wrongdoing is not an adverse employment action). Neither Cheathams nor Teklehaimanot argue that their suspensions were not paid. (Pls.'s Resp. 10-11.) Nor have they produced evidence that they were not paid regularly and on-time during their suspensions. Unlike *White*, there is not evidence that they suffered because they were not sure if they would be paid.

Third, even after *White*, when plaintiffs have failed to produce evidence that a paid suspension materially altered their employment conditions, courts have held that paid suspensions pending prompt investigations are not adverse employment actions. *Solomon v. Phi. Newspapers, Inc.*, No. 05-05326, 2008 WL 2221856, at *17 (E.D. Pa. May 21, 2008) (stating "courts have held that a suspension with pay pending a prompt investigation into allegations of wrong-doing does not constitute an adverse employment action" and collecting cases); *Singletary v. Missouri Dep't of Corrs.*, 423 F.3d 886, 891-92 (8th Cir. 2005). District courts within the Seventh Circuit have noted that in some cases, paid suspensions are not actionable employment actions, even

in the context of retaliation. *Renta v. County of Cook*, 735 F. Supp. 2d 957, 973
(N.D. Ill. 2010).

Here, neither plaintiff has produced any evidence that the unpaid suspensions
materially altered their work conditions, so they do not have evidence from which a
reasonable jury could find that the actions constituted adverse employment actions.
*See e.g., Glover v. Bd. of Educ. of Rockford Pub. Schs., Dist. 205*, 187 Fed. Appx. 614, 617
(7th Cir. 2006) (unpublished) (noting that the Seventh Circuit has held that "denying a
transfer with no immediate consequences to pay can qualify as an adverse employment
action if it 'significantly reduces the employee's career prospects,'" but finding that the
district court properly granted summary judgment to the defendants because the
plaintiff had not attempted to show that the transfer he sought would increase his pay
or benefits or enhance his future career) (quoting *Herrnreiter,* 315 F.3d at 744).

Further, the paid suspensions pending investigation  and their resulting
warnings are similar to progressive discipline cases. In fact, district courts have
analogized cases of suspension with pay to the Seventh Circuit's analysis for whether
progressive discipline can constitute an adverse employment action. *Myart v. Doubletree*,
No. 01-C-4083, 2002 WL 63814, at *5 (N.D. Ill. Jan. 17, 2002) (unpublished). In *Myart* the
court determined that a suspension with pay is similar to progressive discipline that the
Seventh Circuit has found not be an adverse employment action in *Oest v. Illinois
Department of Corrections* discussed below. *Id.* Further, the plaintiff had not shown that
the suspension with pay changed her employment status through economic harm or in

some other manner. *Id. But see Turner v. Marshall Field & Co.*, No. 97-C-6354, 1999 WL 168465, at *8 (N.D. Ill. 1999) (unpublished) ("Although neither party cites to any case law regarding whether a suspension constitutes an adverse action when an employee is ultimately reinstated and experiences no loss in pay, seniority or benefits, the court finds that it could.").

The Seventh Circuit has explained that while "negative evaluation, written warnings, and placement on 'proof status' are putatively disciplinary measures," they are not adverse employment actions under Title VII if they do not result in tangible job consequences. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) (quoting *Longstreet v. Ill. Dep't of Corrs.*, 276 F.3d 379, 384 (7th Cir.2002)); *Hilt-Dyson*, 282 F.3d at 466 (stating "on numerous occasions, we have stated that negative evaluations, standing alone, do not constitute adverse employment actions"); *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 613 (7th Cir. 2001).

In *Whittaker*, the Seventh Circuit explained that there could be circumstances in which a reprimand could carry immediate consequences, such as ineligibility for promotion, transfer, or an advantageous increase in responsibility, that would materially alter the terms and conditions of employment. 424 F.3d at 648. However, the court affirmed summary judgment for the defendants when the plaintiff had not produced any evidence that her negative evaluation and warnings was accompanied by any of these types of consequences. *Id.* Even in a progressive discipline system, which Park Center may have although there is no evidence on that point, reprimands are only

adverse employment actions when they come with an immediate consequence. *Oest,* 240 F.3d at 613. While consecutive reprimands may bring an individual closer to termination, that is not an "inevitable consequence of every reprimand" as "job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Id.*

Neither Cheathams nor Teklehaimanot presented any evidence that would show any economic or future opportunity consequences from the paid suspensions or the disciplinary warnings that accompanied them. It is conceivable that the final warning given to Cheathams as a result of the investigation could have had financial consequences for Cheathams by impacting future promotions or pay increases. But he has not produced evidence to show this. Further, Cheathams resigned after working only three days after his suspension. (Cheathams Dep. 162.) Even if receiving the final warning and paid suspension would have impacted his ability to be promoted or obtain a raise, he did not stay at Park Center long enough to realize these consequences. The Seventh Circuit has held that when a plaintiff was given a three-day unpaid suspension that was never served because she quit before she was scheduled to take it, she did not suffer an adverse employment action because she did not realize the economic effect of the action. *Whittaker,* 424 F.3d at 647. Similarly, because he quit three days after his suspension ended, Cheathams did not suffer any economic consequences that would have resulted from it. Thus the paid suspensions pending prompt investigations did not constitute adverse employment actions against either plaintiff.

In his complaint, Cheathams alleged that he was constructively discharged from Park Center (Pls.' Am. Complaint ¶ 13), but he does not continue this argument in his response in opposition to the motion for summary judgment. (*See* Pls.' Resp. 10-11.) Thus he has waived this argument. *See Perez v. Illinois*, 488 F.3d 773, 776-77 (7th Cir. 2007) (stating that "perfunctory and undeveloped arguments are deemed waived").[17]

In sum, Cheathams and Teklehaimanot do not have evidence to support a finding that they suffered adverse employment actions from their paid suspensions pending investigation. Cheathams abandoned his argument that he had been constructively discharged, and he does not have evidence to support it anyway. Thus, Cheathams cannot establish that he suffered an adverse employment action as required

---

[17] In any case, Cheathams does not have evidence to show that his "working conditions were so intolerable as a result of unlawful discrimination that a reasonable person would be forced into involuntary resignation" as required for constructive discharge. *See Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 517 (7th Cir. 1996). Cheathams returned to work for three days after the incident on December 25, 2007. (Cheathams Dep. 162.) His only evidence about his working conditions during this time is his testimony that his work environment was hostile because people would clam up when he entered a room and Park Center failed to communicate about the December 25, 2007 incident. (Cheathams Dep. 144-46, 162.) This evidence cannot support a finding that Cheathams' work environment was so unbearable that he was compelled to quit. *Cf. Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (plaintiff's assertion that her superior refused to greet her or speak to her and cancelled a conference call by her were "trivial matters" that could not rise to the level of actionable retaliation).

He also cannot show constructive discharge through an employer act showing that the "handwriting [was] on the wall," *EEOC v. Univ. of Chi. Hosp.*, 276 F.3d 326, 331 (7th Cir. 2002), because his proposed testimony is that he understood that he was not being terminated following his paid suspension. (Cheathams Dep. 94.)

under the indirect method. Teklehaimanot can only establish that she suffered an adverse employment action when her employment was terminated.

Plaintiffs also cannot establish a *prima facie* case of race discrimination because they cannot show that a similarly situated individual outside of their class was treated more favorably. A similarly situated employee is one who is "directly comparable to [the plaintiff] in all material respects." *Rogers v. City of Chi.*, 320 F.3d 748, 755 (7th Cir. 2003) *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir. 2002). Both plaintiffs point to Flosenzier as a similarly situated employee outside of their class who was treated more favorably. In disciplinary cases such as this one, a plaintiff must show "that he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000). This includes showing that the employees had the same supervisor, were subject to the same standards and workplace rules, and "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18; *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003). A court should also consider the comparable experience, education, and qualifications of the two employees. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

Park Center argues that Flosenzier was not similarly situated to Teklehaimanot and Cheathams because she had a different position and ranked lower than them, she had started at Park Center that month and was working out of training for the first time that night, she had not been instructed on how to position herself between a client and

37

the door, and she had not received any reprimands before. (Def.'s Br. 24.) In response, plaintiffs argue that Flosenzier was similarly situated to them because she did not report to them, she was aware of the restraint and positioning requirements, and she should have been trained before she started working. (Pls.' Resp. 11.) They also argue that Flosenzier violated Park Center's policy of reporting any client statements about intent to run away. (*Id.*)

In deciding the motion for summary judgment, the court will accept that Flosenzier had the same level of responsibility as plaintiffs. The court will also accept that Cheathams had not undergone the restraint training and that Flosenzier was aware of the restraint policy because of the December 14, 2007 e-mail and the December 4, 2007 staff meeting. Still, Flosenzier is not similarly situated to plaintiffs because of their varying levels of experience.

The fact that Flosenzier was in her first month at the Redwoods and working independently for the first day is enough of a mitigating circumstance to render her not similarly situated to plaintiffs. *See e.g., Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 643 (7th Cir. 2008) (finding that two employees were not similarly situated when one had been in her position for four and a half years and the other for less than a year); *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (a substantial gap of four years experience precluded a finding that two employees were similarly situated). In *Bio*, the plaintiff, who was terminated for performance problems, argued that he was similarly situated to an employee with the same exact position and supervisor but with four years less

experience. *Id.* The court found that the two men were not similarly situated because the performance complaints for the other employee occurred during his first eight months of employment "while he was still learning how to perform his duties." *Id.*

Similarly, when the incident occurred on December 25, 2007, Flosenzier was working independently for the first time. She had only been at Park Center for twenty-two days whereas Teklehaimanot had been there for nine months and Cheathams for three and half months. (Cheathams Dep. 50.) While these gaps in experience were not as sizeable as in *Bio*, Flosenzier was working independently for the very first time on the evening in question and was therefore still learning the duties of her job.

Further, employees are not similarly situated if they do not have "similar disciplinary histor[ies]." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008). In this case, Cheathams had been previously reprimanded for unprofessional conduct towards clients. (Cheathams Dep. 50; Def.'s Exh. I to Br. in Supp. of Summ. J., DE # 26-4.) There is no evidence that Flosenzier had been reprimanded before December 25, 2007. Thus, plaintiffs have not produced any evidence that a similarly situated employee was not placed on paid suspension.

Because she was terminated for keeping confidential information in violation of Park Center policy and the direct instructions of her superiors, Teklehaimanot needs to point to an employee outside of her class who engaged in similar conduct. *Oest*, 240 F.3d at 614 (examining whether the plaintiff had found a similarly situated employee who engaged in each of the types of conduct that allegedly resulted in the

adverse employment actions against her). She has not produced any evidence that an employee outside of her protected class violated Park Center' HIPAA or confidentiality policies or was insubordinate and was not terminated. Thus, both Cheathams and Teklehaimanot cannot establish *prima facie* cases of discrimination based on race.

If plaintiffs had established *prima facie* cases of discrimination, the burden of production would shift to Park Center to articulate a legitimate, nondiscriminatory reason for the actions taken against the employees. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). If Park Center met this burden of production, plaintiffs would have an opportunity to prove by a preponderance of the evidence that Park Center's proffered nondiscriminatory reason was not truthful, but rather a pretext for discrimination. *Id.*; *Williams,* 856 F.2d at 923. Since both plaintiffs have not carried their initial *prima facie* burdens, the court does not need to determine whether they can establish pretext. In fact, plaintiffs do not address the issue of pretext in their brief and focus only on establishing a *prima facie* case. (*See* Pls.' Resp. 9-11.) However, some of plaintiffs' listed factual disputes appear to be directed towards this issue, so the court will briefly address plaintiffs' inability to prove pretext for the sake of completeness and to stress that they cannot prevail under the indirect method. *Burke v. Wis. Dep't of Trans.,* 464 F.3d 744, 754 (7th Cir. 2006).

A plaintiff can demonstrate that an employer's explanation is pretextual directly by showing that "the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent." *Hobbs v. City of Chi.*, 573 F.3d 454, 462

(7th Cir. 2009). Thus, to prove pretext, the plaintiff must show that the employer's explanation is a lie, "specifically a phony reason." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). To do so, the plaintiff "must *specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere,* 83 F.3d 833, 845 (7th Cir. 1996) (citing *Collier v. Budd Co.,* 66 F.3d 886, 893 (7th Cir.1995)) (emphasis in *Mills*). Plaintiffs can "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence." *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 541 (7th Cir. 2007). In this case, neither plaintiff can make either a direct or indirect showing that Park Center's proffered reason for their paid suspension or for Teklehaimanot's termination was pretext for discrimination.

Neither plaintiff can prove pretext because they do not specifically refute Park Center's proffered reasons for suspending or firing them and cannot show that these reasons were phony. *Mills*, 83 F.3d at 846. First, Teklehaimanot seems to be questioning the veracity of Park Center's proffered explanation that it fired her for not returning the confidential documents by noon on January 11, 2008, when she points out that she mailed the documents to them on that day.[18] (Pls.' Resp. 6.) She also stresses that Virgo admitted that these documents could be helpful to the investigation and that Virgo

---

[18] Plaintiffs state that the Certified Mail Receipt is attached to their brief at Exhibit 12, but the court cannot find this attachment. However, the court rules on this issue under the presumption that this document exists as plaintiffs purport.

randomly chose the date of January 11, 2008. (*Id.* at 2, 6.) While Teklehaimanot states that she received Virgo's letter on January 11, 2008, she does not produce any evidence that she tried to comply by the deadline or to notify Virgo that she intended to comply. In fact, Teklehaimanot also admitted that there was no reason that she did not return the documents by noon on January 11, 2008. (Teklehaimanot Dep. 149.) She also cannot remember whether she kept copies of the statements in violation of Park Center's instruction to her.

The evidence shows that Teklehaimanot did not comply with the letter, and that Park Center is credible in finding that she had not complied. It is immaterial that Virgo picked the date at random. In determining pretext, the plaintiff cannot just show that the action was taken for "incorrect or poorly considered reasons;" she must "establish that the employer did not honestly believe the reasons it gave for terminating" her. *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999). It does not matter if an employer's decision-making "exhibits poor business judgment or is erroneous." *Id.* Park Center's explanation that it terminated Teklehaimanot because she breached its confidentiality and HIPAA policies is a credible, legitimate, non-discriminatory reason for her termination. In addition to her breach of Park Center's confidentiality and HIPAA policies, Teklehaimanot's insubordination was sufficient to warrant her termination. *See Atanus v. Perry,* 520 F.3d 662, 674 (7th Cir. 2008).

Second, plaintiffs appear to argue that Park Center's stated reason for placing Cheathams on paid suspension, that it needed to investigate D.M.'s escape and that

Cheathams did not correctly position himself to prevent the escape, was pretextual because Cheathams had not been trained to restrain clients. (*See* Pls.' Resp. 3.) They appear to argue that the reason was pretextual because Flosenzier, who was not placed on paid suspension, was aware of Park Center's restraint and positioning policy because of the December 14, 2007 e-mail and the December 4, 2007 staff meeting. (*Id.*) They also argue that Flosenzier violated Park Center policy by not immediately telling them that D.M. said he wanted to run away. These arguments do not support a finding of pretext.

When Park Center placed Cheathams on paid suspension it was so that it could investigate what had happened on December 25, 2007. When making the decision to suspend Cheathams and not Flozenzier, Park Center could have honestly believed that Cheathams should have had a better understanding of Park Center procedures than Flosenzier because he had been working for several months longer than she had, had attended at least one more staff meeting than she had on restraints, had instruction on positioning, and had completed the Nonviolent Crisis Intervention training, even if it did not specifically cover restraints. Second, in its final warning to Cheathams, Park Center did not state that he was wrong only for not restraining D.M. It stated that he erred by not using the Walkie-Talkie as instructed to get help from staff members who were trained in the team control intervention and by not using correct positioning which Cheathams testified that he was trained to do. (Def.'s Exh. N.) Therefore,

Cheathams has not offered any evidence that Park Center's purported reason for placing him on paid suspension was phony or a lie.

Third, plaintiffs appear to argue that Park Center's stated reason for placing Teklehaimanot on suspension, her failure to immediately assist Cheathams when the alarms sounded, was pretextual. They argue that although two staff members were required to respond, Flosenzier could have responded and Teklehaimanot did not know that Flosenzier would not respond because she had not been trained yet. However, this evidence does not support a finding that Park Center's explanation was a lie. Again, like for Cheathams, Park Center placed Teklehaimanot on paid suspension so that it could investigate what happened. It is also credible that they would hold her to higher standards than Flosenzier who was just out of training. In fact, Teklehaimanot did get up to help Cheathams, she just did not do so after the first alarms sounded. So it is not unbelievable that Park Center would expect Teklehaimanot and not Flosenzier to know that Cheathams needed help.

In sum, neither plaintiff has evidence to support a claim of discrimination based on race. They do not have evidence to show that they suffered adverse employment actions when they were placed on paid suspension pending investigation. They also have not pointed to a similarly situated employee who received more favorable treatment. Even if they could establish a *prima facie* case of discrimination, they cannot prove that Park Center's stated reason for placing them on paid suspension and terminating Teklehaimanot were pretexts for invidious discrimination.

*C.*		*Retaliation*

Under Title VII, an employer cannot "discriminate against any of his employees" because the employee "has opposed any practice made an unlawful employment practice by" Title VII "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3. To prove retaliation in violation of Title VII, plaintiffs can again proceed under either the direct or indirect methods. Under the direct method, plaintiffs need direct evidence of a statutorily protected activity, an adverse employment action, and a causal connection between the two. *Sitar v. Ind. Dep't of Trans.*, 344 F.3d 720, 728 (7th Cir. 2003). Under the indirect method, a plaintiff must have evidence to support the following elements of a *prima facie* case:

> (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

*Id*. Like in the discrimination context, if the plaintiff establishes a *prima facie* case of retaliation, the burden of production switches to the employer to "come forward with a legitimate, non-invidious reason for its adverse action." *Id.* If the employer does this, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. *Id.* Plaintiffs have not argued that they can succeed with the direct method (Pls.' Br. 11-13), so the court will focus its analysis on the indirect method.

Plaintiffs argue that they both engaged in statutorily protected activity when they complained that Park Center's African-American clients were treated worse than its Caucasian clients. (Pls.' Br. 12.) Teklehaimanot also argues that she engaged in protected activity when she wrote her letter to Wilson. Park Center stated that Teklehaimanot based her claim on her complaints about racist comments from D.M., but Teklehaimanot states that those statements are not part of her retaliation claim. (*Id.*) There is evidence that Cheathams complained to Virgo about unequal treatment received by African-American clients (Virgo Dep. 68), but plaintiffs have not produced or cited to any evidence that Teklehaimanot complained about unequal treatment of African-American clients. In any event, Park Center does not argue that this element is not met so the court will assume that it is.[19]

Plaintiffs argue that their paid suspensions and Teklehaimanot's termination were adverse employment actions. The standard for an adverse action for retaliation under 42 U.S.C. § 2000e-3(a) is broader than the standard for an adverse action for discrimination under 42 U.S.C. § 2000e-2(a). *Whittaker*, 424 F.3d at 648 (7th Cir. 2005).

---

[19] Neither party has addressed whether protesting the unequal treatment of clients is a protected activity under Title VII. 42 U.S.C. § 2000e-3. Plaintiffs have not produced evidence that these complaints amounted to opposition of an employment practice made unlawful by Title VII. The City of Fort Wayne Metropolitan Human Relations Committee dismissed Cheathams' claim of retaliation because it found that he had not engaged in an activity protected by Title VII. (Def.'s Exh. R to Def.'s Br. in Supp. of Summ. J., DE # 26-4 at 22.) In arriving at this conclusion, it determined that the mistreatment of clients was not an unlawful employment action under Title VII. (*Id.*)

The court also notes that nothing in Teklehaimanot's letter to Wilson indicates that she was complaining about any discriminatory practice at the Redwoods. (Def.'s Exh. L.)

That is because "retaliation may take so many forms, while § 2000e-2(a) is limited to discrimination 'with respect to [the worker's] compensation, terms, conditions, or privileges of employment.'" *Id.* (quoting 42 U.S.C. § 2000e-3(a) and *Washington v. Ill. Dep't of Revenue,* 420 F.3d 658, 659 (7th Cir. 2005)). In the retaliation context, an adverse action is anything that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Washington,* 420 F.3d at 662. The Seventh Circuit has held that "written reprimands[ ] fall[ ] short of this broader standard." *Whittaker*, 424 F.3d at 648.

Further, the plaintiff must show that "only she, 'and not any otherwise similarly situated employee who did not complain, was ... subjected to an adverse employment action.'" *Rogers,* 320 F.3d at 755 (quoting *Stone v. City of Indianapolis,* 281 F.3d 640, 642 (7th Cir. 2002)). As in the discrimination context, a similarly situated employee is one who is "directly comparable to [the plaintiff] in all material respects." *Grayson,* 308 F.3d at 819.

The plaintiffs may be able to show that their paid suspensions constitute adverse employment actions under the broader standard for adverse actions in retaliation actions. *See White,* 548 U.S. at 72-73. However, the court need not reach this issue because plaintiffs do not have evidence to meet another element of a *prima facie* case - that they were treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Plaintiffs point to Flosenzier as a similarly situated employee who did not engage in statutorily protected activity. However, as

already determined, plaintiffs do not have evidence to support a finding that Flosenzier was similarly situated to them.

Plaintiffs also argue that they received different treatment than employees involved in other runaway incidents who had not engaged in statutorily protected activity. (Pls.' Resp. 13.) According to plaintiffs, there were four other runaway incidents at the Redwoods between August, 2007 and the incident of December 25, 2007. (Pls.' Br. 4.) After the September, 2007 incident, none of the staff involved were suspended and before that none of them had complained about the treatment of African-American clients. (Virgo Dep. 39-40.) Virgo's proposed testimony is that no action was taken against the staff involved in that incident because at that time Park Center had a no restraint policy for runaways. (*Id.* at 40.) Plaintiffs do not refute this testimony. Therefore, the employees present at this incident were not similarly situated to plaintiffs because there was no policy of restraint at that time.

Plaintiffs provide very little information about the other three incidents - producing only staff e-mail accounts of the events with unaccredited handwritten notes stating that no one was suspended after each one. (Pls.' Exh. 5, DE # 31-5.) Plaintiffs cannot use these three incidents to build a *prima facie* case of retaliation because there is no evidence as to whether the staff involved in these incidents ever complained about unfair treatment of African-American clients or their work environment. *Winsley v. Cook County*, 563 F.3d 598, 606 (7th Cir. 2009). Further, these three events are not similar to the event of December 25, 2007. In one, the client ran away from school, in another staff

were told to let the client leave if he wanted to, and in the third, a staff member successfully restrained the potential runaway. (Pls.' Exh. 5, DE # 31-5.) Plaintiffs contend that during the last incident a staff member did not assist with the restraint as required by policy and she was not suspended. However, the only evidence plaintiffs have to this effect is the unaccredited handwriting on an e-mail about the event which is likely not admissible at trial. (*Id.*) Further that incident is still distinguishable because the client did not actually run away. Therefore, plaintiffs have failed to point to any similarly situated employees who were present at a runaway incident and were not placed on paid suspension pending investigation.

Again, Teklehaimanot has not pointed to any similarly situated employee that violated Park Center's confidentiality policy or was insubordinate, but did not complain about employment practices, and was not terminated. Therefore she has not produced evidence that another employee was similarly situated to her. In sum, neither plaintiff can establish a *prima facie* case of retaliation because they cannot point to employees who were similarly situated to them.

Park Center argues that if Cheathams' claims of discrimination and retaliation survive summary judgment, this court should find that he failed to mitigate his damages. (Def.'s Br. 32.) Because the court will grant summary judgment to Park Center on all of Cheathams' claims, it does not need to reach the issue of mitigation of damages.

## IV. CONCLUSION

For the foregoing reasons, Park Center's motion for summary judgment

(Def.'s Mot. for Summ. J., DE # 53) is **GRANTED.** Because no claims remain against the

defendant in this case, the clerk is directed to **ENTER FINAL JUDGMENT** in favor of

defendant Park Center, Inc. and against plaintiffs Nigist Teklehaimanot and Ovadis

Cheathams, stating that Teklehaimanot and Cheathams shall take nothing by way of

their complaint.

**SO ORDERED.**

Date: April 12, 2011

 s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT